In re Kenneth J. DALY, Debtor.

Western Surety Company, Plaintiff,

v.

Kenneth J. Daly, Defendant.

No. 99 B 43932(AJG).
ADV. No. 99/8651A.

United States Bankruptcy Court,
S.D. New York.

April 19, 2000.

Kenneth J. Daly, New York City, debtor pro se.

Stockman Wallach Lentz & Gamell, LLP, New York City, of counsel Debra J. Heller, for Western Surety Company.

**MEMORANDUM DECISION DENYING THE DEFENDANT'S MOTION TO DISMISS AND FOR SUMMARY JUDGMENT AND GRANTING THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

ARTHUR J. GONZALEZ, Bankruptcy Judge.

This matter came before the Court on January 27, 2000 upon the motion [1] by the Defendant, Kenneth Daly ("Daly" or the "Debtor" or the "Defendant") for summary judgment ("Daly's Motion") on the complaint filed by the Plaintiff, Western Surety Company ("Western" or the "Plaintiff") objecting to the discharge of the Debtor pursuant to 11 U.S.C. § 523(a)(4) [2] (the "Dischargeability Complaint"), and Western's motion for summary judgment on the Dischargeability Complaint ("Western's Motion"). Upon reviewing the pleadings and hearing the arguments presented to the Court, the Court makes the following findings of fact and conclusions of law.

## FACTS

On June 18, 1999 Daly filed for protection under Chapter 7 of the United States Bankruptcy Code. In 1990 Daly was appointed as a personal representative of a probate estate (the "Estate") by the Michigan Probate Court (the "Probate Court"). Daly was required by the Probate Court to post a bond to guarantee his performance in the administration of the Estate. Western posted the bond on Daly's behalf. In proceedings before the Probate Court in 1991, two claimants of the Estate (the "Claimants") objected to Daly's August 6, 1991 petition to declare the Estate insolvent, alleging that Daly concealed a number of assets owned by the decedent, specifically an interest in real estate and a

---

1. As will be discussed later, the Defendant's motion, although captioned as a motion for summary judgment, will also be considered by the Court as a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(5) and 12(b)(6).

2. Hereinafter all references to sections will be to Title 11 of the United States Code unless otherwise specified.

promissory note requiring a Michigan partnership to pay $100,000 to the decedent and his wife. The Claimants also alleged that the decedent was in possession of a substantial amount of liquid assets which are not reflected in the inventory filed with the Probate Court; that Daly allowed assets of the Estate to be seized by a bank with a prearrangement that the assets be transferred to an interest owned by the surviving spouse; that assets of the decedent were fraudulently conveyed by the decedent prior to his death; that Daly spent approximately $16,000 of the assets of the Estate overseeing an Estate which he claims has never had any assets; that Estate assets have not been properly or fully evaluated; and that it appears that the Estate assets are being dissipated and/or manipulated so as to create the appearance of insolvency.

In its July 1992 Opinion and Order (the "1992 Order"), the Probate Court found that although the existence of other property interests were raised by the Claimants, the only asset that did not pass by operation of law to the decedent's surviving spouse was 1,080 shares of stock in A & R Bark Haulers, Inc., ("A & R Bark") aka Ralph Schultz Trucking, Inc. The equipment used by A & R Bark was owned by an entity known as A & R Ltd. and leased to A & R Bark. The sole partners of A & R Ltd. were the decedent's spouse and son. In 1989, A & R Bark obtained loans from Financial Federal Credit ("FFC") in the amount of $997,067 which were guaranteed by the decedent, his wife, and other entities (apparently FFC was also granted a security interest in all of the equipment owned by the different entities). A & R Ltd. also obtained loans in 1989 in the amount of $188,467 from FFC which were guaranteed by the decedent, his wife, and other business entities. At the time of the decedent's death, the dece-

dent, his wife, and their business entities were liable to FFC for $1,185,534.

A & R Bark was being run by Daly until December 1990 when A & R Bark ceased doing business. Daly did not obtain court authority to run A & R Bark. In December 1990 FFC foreclosed on both A & R Bark's assets and A & R Ltd.'s assets in order to satisfy a debt due of $687,185.18 from A & R Bark and $107,553.84 from A & R Ltd. for a total of $794,719.02 (the Probate Court noted confusion over the reduced amount of the indebtedness). In anticipation of foreclosure, Daly had all of the machinery and equipment (owned by A & R Ltd.) appraised, which reflected a fair market value of $901,950 or a forced liquidation value of $695,800. According to Daly, when A & R Bark ceased operations it had a negative net worth of at least $144,667 and the shares of stock of the company had no value. No audit was conducted nor were any books examined due to a shortage of funds to hire an accounting firm.

In January 1991 FFC transferred all of the assets it had foreclosed upon to Quality Bark, a new corporation formed and operated by Daly for $730,000 (apparently this amount differs from that alleged by the Claimants; they allege $628,350). After an evidentiary hearing, the Probate Court, in its 1992 Order, denied Daly's petition to declare the Estate insolvent and appointed a special fiduciary (the "Special Fiduciary") to investigate the insolvency of the Estate.[3] The Probate Court further ordered that Daly be surcharged for any fees arising out of the appointment of the Special Fiduciary. In a subsequent order issued in May 1993 (the "1993 Order"), the Probate Court ordered the Defendant to return attorneys' fees in the amount of $42,426.28 improperly paid to him by A & R Bark, and to return $10,615.20 improperly paid to him by Quality Bark. In that same order, the Probate Court ordered

---

**3.** The Court has not been provided with any findings of the Special Fiduciary appointed by the Probate Court.

that the failure of Daly to return the required payments (minus previously approved fees) shall result in liability against Western as surety for Daly. Daly did not pay the surcharges, and Western notes that pursuant to its obligations under its bond, Western paid the Estate $50,000 and incurred an additional $13,657.11 in costs and expenses by reason of having issued its bond. Western thereafter commenced a proceeding before the Probate Court for indemnification. Western obtained a judgment against Daly in November 1997 in the amount of $63,657.11.[4] In early 1998, an Order Approving Settlement of Claims and Distribution of Proceeds (the "Settlement Order") was entered in which $200,000 was paid by CNA Insurance Company, Daly's insurance carrier, in settlement of all claims of the Estate against Daly, except that of Western Surety. In May 1999 Western sued to enforce the judgment. Shortly thereafter, Daly filed the within petition for Chapter 7 relief. Western withdrew its motion to enforce the judgment due to operation of the automatic stay.

■ The Dischargeability Complaint was filed by Western on October 7, 1999. The deadline to object to dischargeability of a debt pursuant to § 523 was October 12, 1999. Daly received his discharge on October 22, 1999.[5] Western was issued a second summons and served the second summons and Dischargeability Complaint

on Daly on December 2, 1999.[6] Daly filed his motion on December 22, 1999. Western filed its motion for summary judgment on January 14, 2000.

## INTRODUCTION

■ Although Daly entitles his motion as a Motion for Summary Judgment, he appears to be moving to dismiss the Dischargeability Complaint as well as moving for summary judgment. Daly's Motion specifically states as follows:

> Pursuant to the provisions of Rule 56 of the Federal Rules of Civil Procedure, Kenneth J. Daly Debtor/Defendant moves to dismiss the Complaint filed by Western Surety Company for failure to state a claim upon which relief can be granted and for failing to timely perfect their right to an adversarial hearing.

Accordingly, Daly moves to dismiss Western's complaint for: (1) failure to state a claim upon which relief can be granted; and (2) for failing to timely perfect their right to an adversarial hearing. The brief submitted by Daly, which Daly cites in support of his motion, argues primarily:

> (1) a procedural argument concerning service of the summons and the Dischargeability Complaint;

> (2) that there is no fiduciary relationship within the meaning of § 523(a)(4); and

---

4. Western received $12,000 from Daly's legal malpractice carrier.

5. The issuance of the discharge by the Court has no impact on the dischargeability of any debt that is the subject of a timely filed action objecting to the discharge of that debt. Section 727(b) states as follows:

> Except as provided in section 523 of this title, a discharge under subsection (a) of this section discharges the debtor from all debts that arose before the date of the order for relief under this chapter.

The Debtor receives a discharge pursuant to § 727 subject to the provisions of § 523. Western timely filed its Dischargeability Complaint pursuant to Bankruptcy Rule 4007, which addresses the time limit for filing a

complaint objecting to the discharge of a particular debt under § 523(a)(2), (4), (6), or (15). The filing of such a complaint does not affect the issuance of the Discharge Order. *See* Bankruptcy Rule 4004(c).

6. Daly notes in his papers that he was served with the summons and Dischargeability Complaint on December 6, 1999. Daly, while he does argue procedural defects with respect to the service of the summons and the Dischargeability Complaint, does not appear to be disputing the service of the second summons and complaint on the grounds that it was not served within ten (10) days of the issuance of the second summons. Given that the second summons was issued on November 30, 1999, service on either date represented by the parties would be timely.

(3) that Daly's acts do not constitute defalcation within the meaning of § 523(a)(4).[7]

Federal Rule of Civil Procedure 12(b), incorporated into bankruptcy procedure by Federal Rule of Bankruptcy Procedure 7012(b), provides as follows, in relevant part:

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(b). Based upon Daly's Motion, the Court will treat Daly's Motion as one requesting dismissal. However, since Daly cites Federal Rule of Civil Procedure 56, Daly entitled his motion as one for summary judgment, and the bulk of his brief in support of Daly's Motion appears to argue that there is no genuine issue of material fact that Daly is not a fiduciary and that his acts do not constitute defalcation within the meaning of § 523(a)(4), this Court will treat the remainder of Daly's Motion and related arguments as a motion for summary judgment.

## DISCUSSION

For purposes of the portion of Daly's Motion identified as a motion to dismiss, the Court will address Daly's request for dismissal based upon his procedural arguments as a motion to dismiss due to Western's failure to timely perfect their right to an adversarial hearing pursuant to Federal Rule of Civil Procedure § 12(b)(5), made applicable through Bankruptcy Rule 7012(b), for insufficiency of service of process. The Court will address the portion of Daly's Motion seeking dismissal for failure to state a claim upon which relief can be granted as a motion to dismiss the Dischargeability Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), made applicable through Bankruptcy Rule 7012(b).

The Court will treat the remaining portion of Daly's Motion as a motion for summary judgment on the grounds that there is no genuine issue of material fact that Daly was not a fiduciary within the meaning of § 523(a)(4) and that Daly acts did not constitute defalcation within the meaning of § 523(a)(4).

Western opposes Daly's Motion and moves for summary judgment on the grounds that there is no genuine issue of material fact that Daly committed defalcation while acting in a fiduciary capacity. Therefore, Western contends that it is entitled to judgment as a matter of law.

## MOTION TO DISMISS

### Insufficiency of Service of Process (Fed.R.Civ.P.12(b)(5))

Daly argues that Western's complaint should be dismissed because it failed to perfect its right to an adversarial hearing consistent with the provisions of Rule 7004—service and filing of pleadings and other papers. Daly states in his papers submitted to the Court that he was not served with the Dischargeability Complaint, filed on October 7, 1999, until December 6, 1999. Daly states that Bankruptcy Rule 7004(b)(9) requires Western to serve the Summons and Complaint by mail before the case is closed, that pursuant to Bankruptcy Rule 7004(e), a summons has an effective life of ten (10) days, and that "Western failed to perfect their right to an adversarial hearing by failing to deposit a copy of the summons and complaint in the mail to Debtor, within 10 days of the issuance and before the case was closed on October 22, 1999. This failure deprives

---

**7.** Daly refers to Western's claim as pursuant to § 523(a)(2) and § 523(a)(4) in his Brief in Support of Motion for Summary Judgment.

However, Western's Dischargeability Complaint only refers to § 523(a)(4).

them of their right to initiate an adversary hearing." [8]

Western argues that its service was not procedurally improper. Western states that, due to either a misunderstanding or its receipt of incorrect information, it was under the impression that the clerk's office would serve the summons and Dischargeability Complaint upon the Debtor. On November 30, 1999, Western learned that service had not been done as was its understanding. Western then obtained a second summons pursuant to Bankruptcy Rule 7004(e) and served the second summons and Dischargeability Complaint on December 2, 1999. Western also points out that Daly's argument appears to be based upon the misapprehension that the issuance of the Discharge Order constitutes closing of the case. Western argues that not only is the case not closed, but that the Discharge Order does not affect complaints such as Western's.

■ According to the pleadings submitted by Daly, Daly appears to believe that the granting of Daly's discharge on October 22, 1999, also closes the bankruptcy case. The issuance of the Discharge Order does not close the bankruptcy case, and the case remains open today. At the hearing before the Court, Daly appears to recognize that his case has not been closed, and instead of the argument set forth in his papers about the impact of the case being closed, he argues that it is inequitable to permit re-issuance of the summons, particularly where the re-issuance is done after the time has passed for filing a complaint to determine dischargeability. Daly supports this argument by noting that if the summons could continually be re-issued so long as the underlying complaint is timely, the complainant could conceivably "drag-out" a case for several years.

■ The Court finds no merit to Daly's argument that the Dischargeability Complaint should be dismissed for an insuffi-

ciency of service of process. The last day to file a complaint to oppose discharge was set for October 12, 1999 pursuant to Bankruptcy Rules 4004(a) and 4007(c). Western filed its Dischargeability Complaint pursuant to § 523(a)(4) on October 7, 1999, prior to the October 12, 1999 deadline. Although service of the Dischargeability Complaint was not completed prior to the expiration of ten (10) days following the issuance of the summons on October 7, 1999 pursuant to Bankruptcy Rule 7004(e), a second summons was issued pursuant the same Bankruptcy Rule. The second summons was served within ten (10) days after its issuance in compliance with Bankruptcy Rule 7004(e).

Regarding Daly's argument that it would be inequitable to permit the re-issuance of the summons following the passing of the deadline to object to dischargeability of debts in that the complainant could conceivably continue to fail to serve summons and have them re-issued for several years, intentionally delaying the closing of the bankruptcy case, the Court also finds no merit in this argument. The concern raised by Daly is resolved by Federal Rule of Civil Procedure 4(m), made applicable to the matter before the Court by Bankruptcy Rule 7004(a), which provides as follows, in relevant part:

> If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period.

Fed.R.Civ.P. 4(m). Accordingly, this Court will not dismiss Western's Complaint based upon Daly's argument that Western failed to perfect a right to an

8. Daly's Brief in Support of Motion for Summary Judgment, page 4, lines 8–11.

adversarial hearing consistent with the provisions of Rule 7004.

### *Failure to State a Claim Upon Which Relief Can be Granted (Fed.R.Civ.P. 12(b)(6))*

■ Daly also moves to dismiss the Dischargeability Complaint for failure to state a claim upon which relief can be granted, presumably pursuant to Federal Rule of Civil Procedure 12(b)(6). Daly does not specifically refer to the basis for his assertion that the Dischargeability Complaint should be dismissed for failure to state a claim for relief, therefore, Daly's argument as to the basis of his argument is unclear. However, it would appear to be premised upon Federal Rule of Civil Procedure 12(b)(6). Federal Rule of Civil Procedure 12(b)(6) is incorporated into bankruptcy procedure by Federal Rule of Bankruptcy Procedure 7012(b). In considering a 12(b)(6) motion to dismiss for failure to state a claim for relief, the Court accepts as true all material facts alleged in the complaint and draws all reasonable inferences in favor of the plaintiff. *See Bolt Electric, Inc. v. City of New York,* 53 F.3d 465 (2d Cir.1995). The motion to dismiss is granted only if no set of facts can be established to entitle the plaintiff to relief. *Walker v. City of New York,* 974 F.2d 293, 298 (2d Cir.1992). In reviewing a 12(b)(6) motion, the Court may consider the allegations in the complaint; exhibits attached to the complaint or incorporated therein by reference; matters of which judicial notice may be taken, *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993), and documents of which plaintiff has notice and on which it relied in bringing its claim or that are integral to its claim. *Cortec Industries v. Sum Holding, L.P.,* 949 F.2d 42, 48 (2d Cir.1991).

When considering Daly's assertion that the Dischargeability Complaint should be dismissed for failure to state a claim upon which relief can be granted, the Court finds no basis to dismiss. In reviewing the Dischargeability Complaint it appears as

though the elements of § 523(a)(4) have been sufficiently pled such that if the Court accepts as true all the material facts alleged, a basis for the requested relief exists.

### MOTIONS FOR SUMMARY JUDGMENT

#### *Summary Judgment Standard*

The basic principles for considering a motion for summary judgment are well settled. Summary judgment shall not be granted unless the Court determines that there is no genuine issue of material fact to be tried and therefore the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Fed.R.Bankr.P. 7056; *see generally Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The burden is upon the moving party to clearly establish the absence of a genuine issue as to any material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. The Court, however, must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the non-moving party. *See United States v. Rem,* 38 F.3d 634, 643 (2d Cir.1994). The movant can meet its burden for summary judgment by showing that little or no evidence may be found to support the non-movant's case. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). "Once a movant has demonstrated that no material facts are in dispute, the non-movant must set forth specific facts indicating a genuine issue for trial exists in order to avoid granting of summary judgment." *See Cifarelli v. Village of Babylon,* 93 F.3d 47, 51 (2d Cir.1996) *(citing Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990)).

#### *Summary Judgment Arguments*

Section 523(a)(4) provides as follows, in relevant part:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

Daly argues that he is not a "fiduciary" with respect to Western within the meaning of § 523(a)(4). Although Daly does not specifically state, he appears to be arguing that there is no genuine issue of material fact as to this issue, thus he would be entitled to judgment as a matter of law. Furthermore, Daly argues that his acts did not constitute defalcation within the meaning of § 523(a)(4), and again is apparently arguing that there is no genuine issue of material fact as to this element and he is thus entitled to judgment as a matter of law.

Western moves pursuant to Rule 56 of the Federal Rules of Civil Procedure, incorporated into bankruptcy procedure by Bankruptcy Rule 7056, and § 523(a)(4) for an order granting summary judgment in favor of Western on its Dischargeability Complaint. Western argues that it is entitled to judgment as a matter of law because there is no genuine issue of material fact that Daly was acting in a fiduciary capacity within the meaning of § 523(a)(4) and that his acts constituted defalcation under the same section.[9] Both parties agree that collateral estoppel should be applied with respect to the Probate Court's findings. The Court need only address collateral estoppel with respect to the defalcation element of § 523(a)(4).

### Fiduciary Relationship

Daly argues that he did not act as a fiduciary on behalf of Western. Daly states that Western must establish the existence of an express or technical trust in order to establish the existence of a fiduciary relationship. Daly contends that the obligations of Daly and Western are and were controlled by the contract executed at the time that Western issued the bond. He further argues that such obligation did not create a trust which meets the requirements of § 523(a)(4) in that there was no "trust res" and that Daly never controlled any of Western's property. Daly focuses his argument on the fact that there is no finding of an "express or technical" trust relationship between Daly and Western and that Western's claim is based only on a contract theory of a right to indemnification. Therefore, Daly argues in summary that Western's claim for a nondischargeable debt must fail "because it is unable to establish the existence of a fiduciary relationship ... that it created a trust with Daly by establishing a definable res and relinquishing to Daly the control over that res at the time that he [sic] relationships [sic] between Western and Daly was created."[10] Daly disagrees with Western's argument that it was subrogated to the rights of the Claimants.

Western argues that Daly was precisely the type of fiduciary contemplated by 11 U.S.C. § 523(a)(4) and his debt to Western is a result of his judicially determined defalcation in his fiduciary capacity. Western further contends that it is subrogated to the rights of the Estate against Daly arising from his breach of his fiduciary obligations. Western contends that there is no issue of material fact as to these elements of § 523(a)(4) and that it is therefore entitled to judgment as a matter of law.

Daly does not dispute that Western acted as a surety to guarantee Daly's performance. However, Daly disputes that Western is subrogated to the rights of the Claimants, and even if they are, he further argues that Western still has no claim as each and every creditor of the Estate has settled its claims in full.

---

9. The parties do not address the fraud element of § 523(a)(4). Therefore, this Court need not examine whether Daly's acts constitute fraud.

10. Daly's Brief in Support for Summary Judgment, page 12, lines 2–4.

Daly misapplies the theory of subrogation. The "general rule of subrogation is that the subrogee stands in the shoes of the prior claim holder, and as such, 'is substituted to all rights and remedies' of the prior claim holder as though the subrogee *were* the prior claim holder." *Old Republic Surety Co. v. Richardson (In re Richardson)*, 178 B.R. 19, 23 (Bankr. D.D.C.1995), *aff'd*, 193 B.R. 378 (D.D.C. 1995), *aff'd*, No. 96–7012, 1997 WL 73202 (D.C.Cir. Feb. 6, 1997). Daly does not dispute that, as the personal representative of the Estate, Daly was acting as a fiduciary. As surety, Western was subrogated to the rights of the Claimants.

The Court notes that bankruptcy courts have found under similar facts that a surety was subrogated to the rights of trust beneficiaries. *See Minnesota Trust Co. v. Yanke (In re Yanke)*, 225 B.R. 428 (Bankr. D.Minn.1998), *aff'd* 230 B.R. 374 (8th Cir. BAP 1999); *In re Richardson*, 178 B.R. at 22–23; *In re Chateaugay Corp.*, 155 B.R. 625 (Bankr.S.D.N.Y.1993), *aff'd*, 177 B.R. 176 (S.D.N.Y.1995), *aff'd* 89 F.3d 942 (2d Cir.1996). In *Yanke*, the defendant was appointed guardian of a minor person and estate. The defendant obtained a bond from the plaintiff-surety and the defendant signed a guaranty in favor of the plaintiff-surety committing to repay the plaintiff-surety all sums that it might be required to pay as surety. The defendant was ultimately found to have breached his duty to the estate and the plaintiff-surety was forced to pay on the bond. The plaintiff-surety then sued the defendant to recover the amounts paid on the bond, and the defendant filed for bankruptcy protection during the pendency of the lawsuit. The plaintiff-surety then instituted an adversary proceeding alleging that the debt was excepted from discharge pursuant to § 523(a)(4), and both parties moved for summary judgment The bankruptcy court ultimately ruled in favor of the plaintiff-surety, finding that the "obligee's status under the original claim for breach of fiduciary duty has transferred from [the ward of the estate] to the Plaintiff under the principles of subrogation." *Yanke*, 225 B.R. at 433. The United States Bankruptcy Appellate Panel of the Eighth Circuit affirmed, applying principles of equitable subrogation. 230 B.R. at 378–79.

In *Richardson*, the court found that where a surety paid beneficiaries of a trust account on behalf of a defaulting trustee of the trust account, the plaintiff-surety is entitled to assert the trust beneficiaries' nondischargeability rights under § 523(a)(4). 178 B.R. at 24. The court in *Richardson* cited § 509 as support for its conclusion that the plaintiff-surety is subrogated to the right of the creditor-beneficiaries. *Id.* at 22. Section 509(a) states as follows, in relevant part:

> an entity that is liable with the debtor on, or has secured, a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment.

Finally, the bankruptcy court in *Chateaugay* noted that "a surety is subrogated to the rights of the creditor when it pays the claim for its principal on a bond ... The surety, through subrogation, may assert all of the creditor's rights." 155 B.R. at 633 (citing *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136, 83 S.Ct. 232, 235, 9 L.Ed.2d 190 (1962)).

The Court finds that Daly's argument that Western has no claim because all creditors of the Estate settled their claim with Daly is without merit. Daly is referring to the Settlement Order. First, the Court notes that the Settlement Order specifically provides that Daly shall remain responsible to Western. Second, once Western paid on the bond, it was subrogated to the rights of the claimants. *See Yanke*, 230 B.R. at 378 ("at the moment the payment is made, the surety steps into the shoes of the obligee and becomes entitled to pursue his cause of action in subrogation against the principal.") (citing *Putnam v. Comm'r of Internal Revenue*, 352 U.S. 82, 85, 77 S.Ct. 175, 177, 1 L.Ed.2d 144 (1956) ("[t]he familiar rule is that,

instanter upon the payment by the guarantor of the debt, the debtor's obligation to the creditor becomes an obligation to the guarantor, not a new debt, but by subrogation, the result of the shift of the original debt from the creditor to the guarantor who steps into the creditor's shoes.")). The entry of the Settlement Order subsequent to the payment on the bond by Western does not alter Western's claim against Daly.

Accordingly, the Court finds that there is no genuine issue of material fact as to Daly's status as a fiduciary within the meaning of § 523(a)(4) and that Western is subrogated to the rights of the Claimants to which Daly was in a fiduciary relationship.

### Defalcation

The only applicable remaining element of § 523(a)(4) is whether Daly's acts constitute defalcation. Both parties agree that the Court should apply collateral estoppel to the findings of the Probate Court as to this issue in that the issues necessarily determined by the Probate Court cannot be re-litigated herein. The parties cite, and append as exhibits to their pleadings, both the 1992 Order and the 1993 Order. Accordingly, this Court will examine both the 1992 Order and the 1993 Order for purposes of collateral estoppel.

To determine whether collateral estoppel should be applied, the Bankruptcy Court "must refer to the preclusion law of the State in which the judgment was rendered." *Rupert v. Krautheimer (In re Krautheimer)*, 210 B.R. 37, 50 (Bankr. S.D.N.Y.1997) (citing *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 380, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985)). The Probate Court decision and the judgment obtained by Western against Daly were rendered in Michigan. The Michigan Supreme Court has determined that collateral estoppel "precluded relitigation of an issue in a subsequent, different cause of action between the same parties where the prior proceeding culminated in a valid, final judgment and the issue was (1) actually litigated, and (2) necessarily determined." *People v. Gates*, 434 Mich. 146, 452 N.W.2d 627, 630 (1990).

Daly argues that the Probate Court found that Daly had been negligent but that there was no finding of a breach of fiduciary duty or any finding sufficient to constitute defalcation.[11] Western alleges that the Probate Court's explicit determinations that Daly had engaged in self-dealing, operated the decedent's business without court authority, and improperly paid himself attorneys' fees exceeding $50,000 demonstrate that Daly's conduct went beyond mere negligence and constituted defalcation warranting the exception of Western's debt from discharge.

The Probate Court represented Daly's argument as being that since the shares of stock of A & R are the only asset of the Estate, and since the uncontroverted testimony establishes that the stock has no value, the Estate is insolvent. Furthermore, the Probate Court notes that the Claimants argued that Daly acknowledged receipt of $30,832.32 owed to Ralph Schultz Trucking, Inc., but testified that he received no money for services rendered to the Estate. The Claimants argued that it was highly unusual for Quality Bark, the new corporation formed and operated by Daly to which all of the assets foreclosed

---

**11.** Daly argues that there must not have been a finding of wrongdoing by the Probate Court, because such a finding would have removed Daly's malpractice carrier from the obligation of defending and indemnifying Estate creditors for Daly's negligence. Based upon the evidence presented on this issue, the Court does not find Daly's argument anything more than speculation by him. The Court has no evidence concerning Daly's agreement with his malpractice carrier and notes that malpractice coverage is more than likely only related to Daly's actions as attorney and not as a personal representative. The Court further finds that Daly's argument that no wrongdoing was committed because no complaint was filed with the Michigan Bar Association against him concerning the Estate is an unsupported conclusion drawn from overbroad inferences.

upon had been transferred, to obtain financing from FFC.

■ Bankruptcy courts are split as to what conduct is necessary to support a finding of defalcation. Many courts within the Second Circuit have attempted to decipher the meaning of the term "defalcation." The Second Circuit issued a decision in 1999 addressing the definition. *The Andy Warhol Foundation for Visual Arts, Inc. v. Hayes (In re Hayes)*, 183 F.3d 162 (2d Cir.1999). The Second Circuit, noting that the precise meaning of defalcation is unclear, cited a 1937 decision by Judge L. Hand concerning defalcation. *See Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510 (2d Cir.). Judge Hand's decision stated as follows in reference to defalcation:

> We do not hold that no possible deficiency in a fiduciary's accounts is dischargeable ... we said that 'the misappropriation must be due to a known breach of the duty, and not to mere negligence or mistake.' Although that word probably carries a larger implication of misconduct than 'defalcation,' 'defalcation' may demand some portion of misconduct; we will assume arguendo that it does. All we decide is that when a fiduciary takes money upon a conditional authority which may be revoked and knows at the time that it may, he is guilty of a 'defalcation' though it may not be a 'fraud,' or an 'embezzlement,' or perhaps not even a 'misappropriation.'

*Id.* at 512. Many courts within the Second Circuit have referenced Judge Hand's decision in attempting to decipher the meaning of defalcation. The Second Circuit in *Hayes* referenced the *Central Hanover* decision but did not define defalcation specifically. *See Hayes*, 183 F.3d at 172. The Court noted the split of authorities as to the extent of misconduct, if any, required, and stated that the issue before it was:

> if a lawyer for an estate is paid by an executor with a duty of his or her own not to overpay, a court's subsequent disagreement as to value of services might

not automatically lead to the conclusion that the resultant debt constituted a 'defalcation,' even under Judge Hand's broad view of that term.

*Id.* The Second Circuit declined to specifically define defalcation stating that, based on the facts of the case, "even assuming, as did Judge Hand, that defalcation demands 'some portion of misconduct,' we hold that Hayes committed a defalcation." *Id.*

The Second Circuit further provided insight into the meaning of defalcation in noting that the lawyers' (Hayes) conduct was "inconsistent with his obligation to deal fairly, albeit at a profit to himself, with the estate in establishing a fee arrangement because there was no attempt to match fees and the value of services— even to the extent of imposing a cap on the fees." *Id.* at 173. The Second Circuit concluded by stating that "[o]n the facts and circumstances presented, we therefore conclude that Hayes's conduct was sufficiently at odds with his fiduciary obligations to constitute a defalcation within the meaning of Section 523(a)(4)." *Id.*

Accordingly, based on the language from the *Hayes* decision, as well as other decisions prior to *Hayes* within the Second Circuit concluding that defalcation requires more than negligence, this Court examines the decision of the Probate Court to determine whether that court made a finding of more than negligence for purposes of collateral estoppel. *See Zohlman v. Zoldan*, 226 B.R. 767, 777–78 (S.D.N.Y. 1998); *Samuels v. Ellenbogen (In re Ellenbogen)*, 218 B.R. 709, 716 (Bankr. S.D.N.Y.1998).

■ The Probate Court found as follows in the 1992 Order:

> The Personal Representative of this estate has been negligent in the handling of this estate and has given the appearance of self-dealing as seen by his appointment as shareholder and president of Quality Bark, Inc. However, the financial liability of the Personal Repre-

sentative is not before the Court at this time.

The Court is not convinced that this estate is insolvent, nor is the Court convinced that assets have not been fraudulently conveyed.

The Probate Court went on to then appoint a Special Fiduciary to investigate the insolvency of the Estate and ordered Daly, as the personal representative, to be surcharged for any fees arising out of the appointment of the Special Fiduciary. As previously stated, this Court does not know the findings of the Special Fiduciary.

The Probate Court noted that it was "astounded that the Personal Representative placed a value of zero on the decedent's business but still found a way to avail himself of approximately $700,000 in credit to begin a new corporation by transfer of 'indebtedness' from the estate's property." The Probate Court further noted that A & R Bark "must have been worth something for the [Defendant] to get that much credit from them."

The Probate Court also specifically states in the 1992 Order that it agrees with arguments made by the claimants which were that:

(1) it is not possible to conclude that the estate is insolvent without an audit;

(2) Daly, as personal representative, did not have the expertise to unravel the complicated business affairs of the decedent and did not take reasonable and prudent steps to hire professionals to make this determination;

(3) Daly operated the decedent's business without court permission which allowed Daly to act without guidelines for accounting, reporting, or distributing funds; and

(4) Daly breached his fiduciary obligation to avoid the appearance of impropriety by self-dealing, making decisions which benefit himself and some creditors, and by exercising very poor judgment in evaluating the assets and liabilities of the principal asset of the estate.

Therefore, not only did the Probate Court find that Daly had been negligent, it also found that Daly's role as shareholder and president of Quality Bark gave the appearance of self-dealing. Additionally, the Probate Court stated that it agreed with the Claimants that Daly's operating of A & R Bark without permission allowed Daly to act without guidelines for accounting, reporting, or distributing, and that Daly breached his fiduciary obligation to avoid the appearance of impropriety by self-dealing. Further, the Probate Court cited the following Michigan statute, underlining what it deemed the most applicable:

A fiduciary is liable to an interested party for any loss to the estate of which he is a fiduciary arising from his embezzlement. A fiduciary is liable for any loss through commingling of funds of an estate with funds of his own; for negligence in the handling of an estate; for wanton and willful mishandling thereof; *for loss through self-dealing and through failure to account for,* or to terminate the estate when it is ready for termination in [sic] an extension of time is not granted by the Court; and for any misfeasances, malfeasance, nonfeasance, other breech [sic] of duty.... (Emphasis added)

Finally, as stated earlier, the Probate Court subsequently ordered in the 1993 Order that Daly return attorney fees improperly paid to him by A & R Bark and Quality Bark. The Probate Court noted that it had previously found Daly negligent. However, the Court finds that the Probate Court is referencing its prior 1992 Order in which it not only found Daly negligent but also found other conduct by Daly as stated above.

Given the broad guidelines to determining what constitutes defalcation set forth in *Hayes*, this Court finds that the issue concerning Daly's defalcation was actually litigated and necessarily determined by the Probate Court's final judgment issued in the 1992 Order and the 1993 Order.

Necessary to the Probate Court's determination that it could not conclude that the Estate was insolvent, its suspicion that assets may have been fraudulently conveyed, that Daly failed to avoid the appearance of impropriety by self-dealing, that the appointment of a Special Fiduciary was necessary, that Daly should be surcharged for such appointment, and that Daly should return attorney fees improperly paid to him, were the findings regarding Daly's actions. The finding of Daly's negligence and his failure to avoid the appearance of impropriety by self-dealing constitute defalcation within the meaning of § 523(a)(4).

In the alternative, even if the Probate Court's findings as to Daly's failure to avoid the appearance of impropriety was not "necessarily determined," this Court finds that there is no genuine issue of material fact that Daly's acts constitute defalcation within the meaning of § 523(a)(4). Daly does not dispute that collateral estoppel should be applied to the Probate Court's finding of negligence. However, to the extent it can be argued that any other finding of the Probate Court was not necessary to the Probate Court's decision, this Court finds that Daly's acts as follows amount to a failure to avoid the appearance of impropriety by self-dealing:

(1) arranging for the transfer of Estate assets, even though it occurred post-foreclosure, to an entity owned in part by Daly as president and shareholder; and

(2) availing himself of fees improperly paid to him by both Quality Bark and A & R Bark.

Daly does not dispute any of the factual assertions made by Western as to Daly's actions concerning the Estate, nor does he dispute the findings of the Probate Court, including that concerning Daly's appearance of self-dealing.[12] Self-dealing is ad-dressed by Michigan statutory law as follows:

700.345. Self-dealing or conflict of interest

Sec. 345. A sale or encumbrance to the independent personal representative ... or a corporation or trust in which the personal representative has a substantial beneficial interest, or a transaction which is affected by a substantial conflict of interest on the part of the independent personal representative, is voidable by a person interested in the estate except one who has consented after fair disclosure, unless either of the following is true:

(a) The will or a contract entered into by the decedent expressly authorized the transaction.

(b) The transaction is approved by the judge after notice to interested persons.

Mich.Comp.Laws Ann. § 700.345 (West 1999). See Ray v. Jobe (In re Jobe), 165 Mich.App. 774, 419 N.W.2d 65, 67 (1988) ("self-dealing concerns itself with a sale or encumbrance of property to the personal representative ... [t]hat is, a breach of fiduciary duty in this regard normally arises where the personal representative drains the assets of the estate to his benefit by engaging in a transaction with the estate at other than fair market value."); Thiel v. Cruikshank, 96 Mich.App. 7, 292 N.W.2d 150, 152 (1980) (executor of estate's failure to advertise estate real property for sale and subsequent private sale of property to son and executor's own purchase of other portion of property from decedent's relative, for less than fair market value, constitutes self-dealing).

Accordingly, Western has met its burden of proving that there is no genuine issue of material fact as to the issues raised herein and is therefore entitled to judgment as a matter of law. This Court DENIES Daly's Motion in its entirety and GRANTS Western's Motion for Summary Judgment. An Order consistent with this

---

12. Daly does not dispute the findings of the Probate Court, his argument is that those findings, taken as a whole, amount only to negligence.

memorandum decision will be entered simultaneously herewith.